IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON/GREENWOOD DIVISION

| | | |
|---|---|---|
| Tawanda Blair, on behalf of J.D.S., | ) | Civil Action No. 8:11-cv-1476-RMG-JDA |
| | ) | |
| Plaintiff, | ) | **REPORT AND RECOMMENDATION** |
| | ) | **OF MAGISTRATE JUDGE** |
| vs. | ) | |
| | ) | |
| Michael J. Astrue, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the Court for a Report and Recommendation pursuant to Local Rule 73.02(B)(2)(a), D.S.C., and Title 28, U.S.C. § 636(b)(1)(B).[1] Plaintiff, proceeding pro se on behalf of her minor son J.D.S., brings this action pursuant to 42 U.S.C. §§ 405(g), 1383(c), seeking judicial review of a final decision of the Commissioner of the Social Security Administration ("the Commissioner"), denying her son's claim for supplemental security income ("SSI").[2] For the reasons set forth below, the Court recommends that the decision of the Commissioner be affirmed.

## PROCEDURAL HISTORY

In 2008, Plaintiff, on behalf of J.D.S., protectively filed an application for SSI children's disability benefits under §§ 1602 and 1614(a)(3)(A) of Title XVI of the Social Security Act ("the Act"), alleging an onset date of November 1, 2007. [R. 60–64.] The

---

[1]A Report and Recommendation is being filed in this case, in which one or both parties declined to consent to disposition by a magistrate judge.

[2] Section 1383(c)(3) provides, "The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title." 42 U.S.C. § 1383(c)(3).

application was denied initially and upon reconsideration by the Social Security Administration ("the Administration"). [R. 25–34, 36–38.] Plaintiff requested a hearing before an administrative law judge ("ALJ") on July 31, 2009 [R. 39–41] and voluntarily waived in writing the right to personally appear and testify at the hearing [R. 9, 58–59].

On September 10, 2010, the ALJ issued his decision, finding J.D.S. was not disabled because his impairments did not cause limitations of the degree required to meet, medically equal, or functionally equal one of the listed impairments. [R. 9–21.] First, the ALJ found J.D.S. was a preschooler on November 17, 2008, the date of the application, and was a school-age child on the date of the ALJ's decision. [R. 12, Finding 1.] Next, the ALJ found J.D.S. had not engaged in substantial gainful activity since the application date [*id.*, Finding 2] and had a severe impairment of asthma [*id.*, Finding 3]. The ALJ further found J.D.S. had a learning disorder with associated speech problems that was a non-severe impairment. [*Id.*]

Then, the ALJ found J.D.S. did not have an impairment or combination of impairments that meets or equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1; the ALJ specifically considered Listing 103.03. [*Id.*, Finding 4.] Further, the ALJ found J.D.S. did not have an impairment or combination of impairments that functionally equals a listing. [*Id.*, Finding 5.] Specifically, the ALJ evaluated the degree of limitation in each of the six functional equivalent domains and found J.D.S. had no limitations in domains 1–5 and less than marked limitations in domain 6. [R. 15–21.] Consequently, based on these findings, the ALJ found J.D.S. not disabled. [R. 21, Finding 6.]

Plaintiff filed a request for review with the Appeals Council [R. 5], but the Appeals Council denied Plaintiff's request for review [R. 1–4] such that the ALJ's decision became the Commissioner's final decision for purposes of judicial review, *see* 20 C.F.R. § 416.1481.  Plaintiff filed a request for judicial review on February 7, 2011 in the United States District Court for the Middle District of Alabama.  [Doc. 1-1.]  The case was transferred to this District on June 16, 2011.  [Doc. 1-20.]

## THE PARTIES' POSITIONS

Plaintiff filed a two-page brief and medical records; Plaintiff did not cite any specific objections to or any error in the ALJ's decision.  [Docs. 29, 29-2, 29-3.]  Rather, Plaintiff argues, "I wouldn['']t be filing a complaint if I didn't need financial help on account of [J.D.S.'s] health and other issues that I do blame the Government for not just against Mich[ae]l Astrue.  It[']s just where it has got to[o] far without any other sources to go to."  [Doc. 29 at 2.]  Plaintiff also filed a reply brief, which appears to indicate J.D.S. sees a pulmonologist and an allergist and has had recent trips to the emergency room.  [Doc. 36 at 1.]  Plaintiff states J.D.S.'s health problems are ongoing and disabling, and he goes to the emergency room every two days for his severe chronic asthma.[3]  [*Id.* at 1–2.]

The Commissioner contends the ALJ's decision is supported by substantial evidence.  [Doc. 35 at 8–14.]  Further, the Commissioner argues the additional evidence provided by Plaintiff to the Court [Doc. 29-2] (1) mostly pertains to one of Plaintiff's other children, not J.D.S., (2) is duplicative of the evidence considered by the ALJ or dated after

---

[3] Plaintiff has also submitted several letters, indicating how the benefits will be used if they are awarded, naming individuals to contact regarding Plaintiff's situation, providing recommendations from individuals that the benefits be awarded, and informing the Court of the family's living conditions and that Plaintiff has "ac[cu]m[]ulated 13,000 Bills with Loans [and] household expenses due to JDS illness" such that bill collectors are harassing her.  [Docs. 37, 38, 39, 42, 43, 46.]

the ALJ's decision, and (3) generally shows J.D.S. continued to receive treatment for asthma. [Doc. 35 at 7–8.]

## STANDARD OF REVIEW

**Liberal Construction of Pro Se Complaint**

Plaintiff brought this action pro se, which requires the Court to liberally construe her pleadings. *Estelle v. Gamble*, 429 U.S.97, 106 (1976); *Haines v. Kerner*, 404 U.S. 519, 520 (1972) (per curiam); *Loe v. Armistead*, 582 F.2d 1291, 1295 (4th Cir. 1978); *Gordon v. Leeke*, 574 F.2d 1147, 1151 (4th Cir. 1978). Pro se pleadings are held to a less stringent standard than those drafted by attorneys. *Haines*, 404 U.S. at 520. Even under this less stringent standard, however, a pro se complaint is still subject to summary dismissal. *Id.* at 520–21. The mandated liberal construction means only that if the court can reasonably read the pleadings to state a valid claim on which the plaintiff could prevail, it should do so. *Barnett v. Hargett*, 174 F.3d 1128, 1133 (10th Cir. 1999). A court may not construct the plaintiff's legal arguments for him. *Small v. Endicott*, 998 F.2d 411, 417–18 (7th Cir. 1993). Nor should a court "conjure up questions never squarely presented." *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985).

**Scope of Judicial Review**

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla—i.e., the evidence must do more than merely create a suspicion of the existence of a fact and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting

*Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citing *Woolridge v. Celebrezze*, 214 F. Supp. 686, 687 (S.D.W. Va. 1963)) ("Substantial evidence, it has been held, is evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'").

Where conflicting evidence "'allows reasonable minds to differ as to whether a [child] is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ),'" not on the reviewing court. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)); *see also Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991) (stating that where the Commissioner's decision is supported by substantial evidence, the court will affirm, even if the reviewer would have reached a contrary result as finder of fact and even if the reviewer finds that the evidence preponderates against the Commissioner's decision). Thus, it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment for that of the Commissioner so long as the decision is supported by substantial evidence. *Laws*, 368 F.2d at 642; *Snyder v. Ribicoff*, 307 F.2d 518, 520 (4th Cir. 1962).

The reviewing court will reverse a Commissioner's decision on plenary review, however, if the decision applies incorrect law or fails to provide the court with sufficient reasoning to determine that the Commissioner properly applied the law. *Myers v. Califano,*

611 F.2d 980, 982 (4th Cir. 1980); *see also Keeton v. Dep't of Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994). Where the Commissioner's decision "is in clear disregard of the overwhelming weight of the evidence, Congress has empowered the courts to modify or reverse the [Commissioner's] decision 'with or without remanding the cause for a rehearing.'" *Vitek v. Finch*, 438 F.2d 1157, 1158 (4th Cir. 1971) (quoting 42 U.S.C. § 405(g)). Remand is unnecessary where "the record does not contain substantial evidence to support a decision denying coverage under the correct legal standard and when reopening the record for more evidence would serve no purpose." *Breeden v. Weinberger*, 493 F.2d 1002, 1012 (4th Cir. 1974).

The court may remand a case to the Commissioner for a rehearing under sentence four or sentence six of 42 U.S.C. § 405(g). *Sargent v. Sullivan*, 941 F.2d 1207 (4th Cir. 1991) (unpublished table decision). To remand under sentence four, the reviewing court must find either that the Commissioner's decision is not supported by substantial evidence or that the Commissioner incorrectly applied the law relevant to the disability claim. *See, e.g.*, *Jackson v. Chater*, 99 F.3d 1086, 1090–91 (11th Cir. 1996) (holding remand was appropriate where the ALJ failed to develop a full and fair record of the claimant's residual functional capacity); *Brehem v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980) (holding remand was appropriate where record was insufficient to affirm but was also insufficient for court to find the claimant disabled). Where the court cannot discern the basis for the Commissioner's decision, a remand under sentence four may be appropriate to allow the Commissioner to explain the basis for the decision. *See Smith v. Heckler*, 782 F.2d 1176, 1181–82 (4th Cir. 1986) (remanding case where decision of ALJ contained "a gap in its

reasoning" because ALJ did not say he was discounting testimony or why); *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984) (remanding case where neither the ALJ nor the Appeals Council indicated the weight given to relevant evidence). On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence. *See Smith*, 782 F.2d at 1182 ("The [Commissioner] and the claimant may produce further evidence on remand."). After a remand under sentence four, the court enters a final and immediately appealable judgment and then loses jurisdiction. *Sargent*, 941 F.2d 1207 (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 102 (1991)).

In contrast, sentence six provides:

> The court may . . . at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . . .

42 U.S.C. § 405(g). A reviewing court may remand a case to the Commissioner on the basis of new evidence only if four prerequisites are met: (1) the evidence is relevant to the determination of disability at the time the application was first filed; (2) the evidence is material to the extent that the Commissioner's decision might reasonably have been different had the new evidence been before him; (3) there is good cause for the claimant's failure to submit the evidence when the claim was before the Commissioner; and (4) the claimant made at least a general showing of the nature of the new evidence to the reviewing court. *Borders v. Heckler*, 777 F.2d 954, 955 (4th Cir. 1985) (citing 42 U.S.C. § 405(g); *Mitchell v. Schweiker*, 699 F.2d 185, 188 (4th Cir. 1983); *Sims v. Harris*, 631 F.2d 26, 28 (4th Cir. 1980); *King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979)), *superseded by*

*amendment to statute*, 42 U.S.C. § 405(g), *as recognized in Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 925 F.2d 769, 774 (4th Cir. 1991).[4]  With remand under sentence six, the parties must return to the court after remand to file modified findings of fact. *Melkonyan*, 501 U.S. at 98.  The reviewing court retains jurisdiction pending remand and does not enter a final judgment until after the completion of remand proceedings.  *See Allen v. Chater*, 67 F.3d 293 (4th Cir. 1995) (unpublished table decision) (holding that an order remanding a claim for Social Security benefits pursuant to sentence six of 42 U.S.C. § 405(g) is not a final order).

## APPLICABLE LAW

A child[5] is considered disabled for purposes of SSI if the child "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(C)(i).  To facilitate a uniform and efficient processing of disability claims, the Administration has promulgated regulations under the Act that reduce the statutory definition of disability to a series of sequential questions.  *See, e.g.*, *Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983) (discussing considerations in adult disability matter and

---

[4] Though the court in *Wilkins* indicated in a parenthetical that the four-part test set forth in *Borders* had been superseded by an amendment to 42 U.S.C. § 405(g), courts in the Fourth Circuit have continued to cite the requirements outlined in *Borders* when evaluating a claim for remand based on new evidence. *See, e.g.*, *Ashton v. Astrue*, No. 6:10-cv-152, 2010 WL 5478646, at *8 (D.S.C. Nov. 23, 2010); *Washington v. Comm'r of Soc. Sec.*, No. 2:08-cv-93, 2009 WL 86737, at *5 (E.D. Va. Jan. 13, 2009); *Brock v. Sec'y of Health & Human Servs.*, 807 F. Supp. 1248, 1250 n.3 (S.D.W. Va. 1992).  Further, the Supreme Court of the United States has not suggested *Borders*' construction of § 405(g) is incorrect. *See Sullivan v. Finkelstein*, 496 U.S. 617, 626 n.6 (1990).  Accordingly, the Court will apply the more stringent *Borders* inquiry.

[5] A "child" is an individual under the age of 18.  *See* 42 U.S.C. § 1382c(a)(3)(C)(i).

noting "need for efficiency" in considering disability claims).  The regulations set forth a three-step sequential analysis for determining whether a child is disabled for purposes of children's SSI benefits:

(1)     Is the child engaged in any substantial gainful activity?[6]  If so, benefits are denied.

(2)     Does the child have a medically severe impairment or combination of impairments?[7]  If not, benefits are denied.

(3)     Does the child's impairment(s) meet, medically equal, or functionally equal an impairment listed in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1?[8]  If so, benefits are granted.

20 C.F.R. § 416.924(a)–(d).

**Assessing Functional Equivalence**

To assess functional equivalence, the Commissioner assesses the interactive and cumulative effects of all of the child's impairments for which there is record evidence, including any non-severe impairments. 20 C.F.R. § 416.926a(a).  First, the Commissioner

---

[6] In determining whether a child has engaged in substantial gainful activity ("SGA"), the Commissioner uses the same rules as used for adults.  *See* 20 C.F.R. § 416.924(b).  SGA is work activity that is both substantial and gainful and involves doing significant physical or mental activities for pay or profit, regardless of whether a profit is realized.  *Id.* § 416.972.

[7] For a child, a medically determinable impairment or combination of impairments is not severe if it is a slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations.  20 C.F.R. § 416.924(c).

[8] In determining whether a child's impairment meets one of the listed impairments, the Commissioner compares the symptoms, signs, and laboratory findings of an impairment, as shown in the medical evidence, with the medical criteria for the listed impairment.  *See Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986).  "If a severe impairment is of the degree set forth in a Listing, and such impairment meets the twelve-month durational requirement, . . . then [the child] 'is conclusively presumed to be disabled and entitled to benefits.'" *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994) (quoting *Bowen v. City of New York*, 476 U.S. 467, 471 (1986)).  "For a [child] to show that his impairment matches a listing, it must meet *all* of the specified medical criteria."  *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (emphasis in original).  It is not enough that the impairment have the diagnosis of a listed impairment; the child "must have a medically determinable impairment(s) that satisfies all of the criteria of the listing."  20 C.F.R. § 416.925(d); *see Bowen v. Yuckert*, 482 U.S. 137, 146 & n.5 (1987) (noting it is the claimant's burden to show a medically determinable impairments and to furnish medical evidence regarding the condition).

considers everything the child does at home, at school, and in the community and determines what the child cannot do, has difficulty doing, needs help doing, or is restricted from doing because of his impairment(s). *Id.* When the Commissioner assesses the child's functional limitations, he considers all the relevant factors contained in 20 C.F.R. §§ 416.924a, 416.924b, and 416.929, including (1) how well the child can initiate and sustain activities, how much extra help he needs, and the effects of structured or supportive settings; (2) how the child functions in school; and (3) the effects of the child's medications or other treatment. *Id.*

Next, the Commissioner considers how the child functions in activities in terms of six domains, which are broad areas of functioning intended to capture what a child can or cannot do. *Id.* § 416.926a(b)(1). These domains are

(1) acquiring and using information;

(2) attending and completing tasks;

(3) interacting and relating with others;

(4) moving about and manipulating objects;

(5) caring for oneself; and

(6) health and physical well being.

*Id.* Limitations are assessed by comparing the child's functioning to the functioning of children of the same age who do not have impairments. *Id.* §§ 416.924a(b)(3), 416.926a(b)(1). To establish functional equivalence, the child must have a medically determinable impairment or combination of impairments that results either in "marked" limitations in two domains or an "extreme" limitation in one domain. *Id.* § 416.926a(a), (d).

A child has a "marked" limitation in a domain when his impairment or combination of impairments seriously interferes with his ability to independently initiate, sustain, or complete activities. *Id.* § 416.926a(e)(2)(i). A "marked" limitation is a limitation that is "more than moderate" but "less than extreme" and may limit only one or several activities or functions. *Id.* A child has an "extreme" limitation in a domain when his impairment or combination of impairments very seriously interferes with his ability to independently initiate, sustain, or complete activities. *Id.* § 416.926a(e)(3)(i). An "extreme" limitation is a limitation that is "more than marked," and "extreme" is the rating given to the worst limitations, although it does not necessarily mean the child experiences a total lack or loss of ability to function. *Id.*

### The Six Domains

(1) *Acquiring and Using Information*

Under the domain of Acquiring and Using Information, the Commissioner must consider the claimant's ability to learn information and to think about and use the information. *Id.* § 416.926a(g). School records provide important information for assessing limitations in this domain. SSR 09-3p, 74 Fed. Reg. 7,511-01, at 7,513 (Feb. 17, 2009). "Poor grades or inconsistent academic performance are among the more obvious indicators of a limitation in this domain provided they result from a medically determinable mental or physical impairment(s)." *Id.* Further, school records may reveal that mental or physical impairments interfere with the claimant's ability to acquire and use information by showing the claimant receives:

> • Special education services, such as assignment of a personal aide who helps the [claimant] with classroom activities in a

regular classroom, remedial or compensatory teaching methods for academic subjects, or placement in a self-contained classroom.

• Related services to help the child benefit from special education, such as occupational, physical, or speech/language therapy, or psychological and counseling services.

• Other accommodations made for the child's impairment(s), both inside and outside the classroom, such as front-row seating in the classroom, more time to take tests, having tests read to the student, or after-school tutoring.

*Id.* The kind, level, and frequency of special education, related services, or other accommodations a child receives can provide helpful information about the severity of the child's impairment(s). *Id.* The Commissioner will also "consider evidence about the child's ability to learn and think from medical and other non-medical sources (including the child, if the child is old enough to provide such information)," and limitations[9] are assessed in all settings, not just in school. *Id.*

(2) *Attending and Completing Tasks*

For this domain, the Commissioner considers how well the child is able to focus and maintain his attention and how well he can begin, carry through, and finish activities, as well as the pace at which he can perform activities and the ease with which he can change them. 20 C.F.R. § 416.926a(h). As with the other domains, limitations[10] in this domain are

---

[9] Examples of limited functioning in Acquiring and Using Information include: (i) inability to demonstrate understanding of words about space, size, or time; (ii) inability to rhyme words or the sounds in words; (iii) difficulty recalling important things you learned in school yesterday; (iv) difficulty solving math questions or computing arithmetic answers; (v) talking only in short, simple sentences and having difficulty explaining what the child means. 20 C.F.R. § 416.926a(g)(3).

[10] Examples of limited functioning in Attending and Completing Tasks include: (i) being easily startled, distracted, or overreactive to sounds, sights, movements, or touch; (ii) slow to focus on, or fail to complete, activities of interest, e.g., games or art projects; (iii) repeatedly sidetracked from activities or frequently interrupt others; (iv) easily frustrated and give up on tasks, including ones the child is capable of completing; and (v) requires extra supervision to keep engaged in an activity. 20 C.F.R. § 416.926a(h)(3).

determined based on various age group descriptors. *Id.* § 416.926a(h)(2). For instance, as a preschooler, the child should be able to pay attention when spoken to directly, sustain attention to play and learning activities, concentrate on activities like putting puzzles together or completing art projects, get his clothes together and dress himself, feed himself, and put away toys. *Id.* The child should usually be able to wait his turn and to change his activity when a caregiver or teacher says it is time to do something else. *Id.* When a child is of school age, he should be able to focus his attention to follow directions, remember and organize his school materials, and complete classroom and homework assignments. *Id.* He should be able to concentrate on details; not make careless mistakes in his work beyond what would be expected in other children who do not have impairments; change his activities or routines without distracting himself or others; and stay on task and in place when appropriate. *Id.* Moreover, the school-age child should be able to sustain his attention well enough to participate in group sports, read by himself, and complete family chores, as well as be able to complete a transition task—such as to be ready for the school bus, change clothes after gym, or change classrooms—without extra reminders and accommodation. *Id.*

(3)    *Interacting and Relating With Others*

With respect to this domain, the Commissioner considers how well the child can initiate and sustain emotional connections with others, develop and use the language of his community, cooperate with others, comply with rules, respond to criticism, and respect and take care of the possessions of others. *Id.* § 416.926a(i). Generally, the child must be able to speak intelligibly and fluently so that others can understand him; participate in

verbal turntaking and nonverbal exchanges; consider others' feelings and points of view; follow social rules for interaction and conversation; and respond to others appropriately and meaningfully. *Id.* A child with limitations[11] in this domain may have various kinds of difficulties:

> For example, the child may not understand:
>
> • How to approach other children,
>
> • How to initiate and sustain social exchanges, and
>
> • How to develop meaningful relationships with others.
>
> Children with impairment-related limitations in this domain may not be disruptive; therefore, their limitations may go unnoticed. Such children may be described as socially withdrawn or isolated, without friends, or preferring to be left alone. These children may simply not understand how to accomplish social acceptance and integration with other individuals or groups. However, because children achieve much of their understanding about themselves and the world from their interactions, the impairment-related limitations of children who withdraw from social interaction may be as significant as those of children whose impairments cause them to be disruptive.

SSR 09-5p, 74 Fed. Reg. 7,515-01, at 7,516 (Feb. 17, 2009) (footnote omitted). Further, the domain of Interacting and Relating With Others is related to the domain of Caring for Yourself, but Interacting and Relating With Others involves the child's feelings and

---

[11] Examples of limited functioning in Interacting and Relating With Others include: (i) inability to reach out to be picked up or held by caregiver; (ii) no close friends or friends are all older or younger than the child; (iii) avoids or withdraws from people the child knows or is overly anxious or fearful of meeting new people or trying new experiences; (iv) difficulty playing games or sports with rules; (v) difficulty communicating with others; e.g., in using verbal and nonverbal skills to express himself, carrying on a conversation, or in asking others for assistance; (vi) difficulty speaking intelligibly or with adequate fluency. 20 C.F.R. § 416.926a(i)(3).

behavior in relation to others while Caring for Yourself involves the child's feelings and behavior in relation to himself.[12]  *Id.* at 7,517.

(4)    *Moving About and Manipulating Objects*

Under this domain, the Commissioner considers how a child moves his body from one place to another and how he moves and manipulates things, which is an assessment of the child's gross and fine motor skills.  20 C.F.R. § 416.926a(j).  Generally, moving the body involves several different kinds of actions: rolling; rising or pulling from a sitting to a standing position; pushing up; raising the head, arms, and legs, and twisting the hands and feet; balancing weight on the legs and feet; shifting weight while sitting or standing; transferring from one surface to another; lowering to or toward the floor as when bending, kneeling, stooping, or crouching; moving forward and backward in space as when crawling, walking, or running, and negotiating different terrains (e.g., curbs, steps, and hills).  *Id.* § 416.926a(j)(1)(i).  Moving and manipulating objects involves several different kinds of actions: engaging the upper and lower body to push, pull, lift, or carry objects from one place to another; controlling the shoulders, arms, and hands to hold or transfer objects;

---

[12] The Administration has provided the following two examples to illustrate the differences between these two domains:

    • If a girl with hyperactivity interrupts conversations inappropriately, we evaluate this problem in social functioning in the domain of "Interacting and relating with others." However, if she impulsively runs into the street, endangering herself, we evaluate this problem in self-care in the domain of "Caring for yourself."

    • If a boy with a language disorder avoids other children during playtime, we evaluate this problem in social functioning in the domain of "Interacting and relating with others." But the child may also use language for "self-talk" to calm himself down in a stressful situation, so the language disorder may cause a limitation in self-regulation, which we evaluate in the domain of "Caring for yourself."

SSR 09-5p, 74 Fed. Reg. 7,515-01, at 7,517 (Feb. 17, 2009).

coordinating the eyes and hands to manipulate small objects or parts of objects. *Id.* §

416.926a(j)(1)(ii). Physical and mental impairments, as well as some medications, may

affect the child's abilities in this domain:

> For example:
>
> • A child with a benign brain tumor may have difficulty with balance.
>
> • A child with rheumatoid arthritis may have difficulty writing.
>
> • A child with a developmental coordination disorder may be clumsy or have slow eye-hand coordination.
>
> . . . [S]ome antidepressant medications may cause hand tremors that interfere with fine motor skills. If these effects persist over time, [the Commissioner will] consider them in this domain.

SSR 09-6p, 74 Fed. Reg. 7,518-01, at 7,520 (Feb. 17, 2009). This domain focuses on

motor limitations[13] caused by the child's impairments or medications, while the domain of

Health and Physical Well-Being involves the cumulative physical effects—such as pain,

weakness, dizziness, nausea, reduced stamina, or recurrent infections—of physical and

mental impairments and their associated treatments that are not addressed in the domain

of Moving About and Manipulating Objects. *Id.*

---

[13] Examples of limited functioning in Moving About and Manipulating Objects include: (i) experiencing muscle weakness, joint stiffness, or sensory loss (e.g., spasticity, hypotonia, neuropathy, or paresthesia) that interferes with motor activities; (ii) trouble climbing up and down stairs or having jerky or disorganized locomotion or difficulty with balance; (iii) difficulty coordinating gross motor movements (e.g., bending, kneeling, crawling, running, jumping rope, or riding a bike); (iv) difficulty with sequencing hand or finger movements; (v) difficulty with fine motor movement (e.g., gripping or grasping objects); (vi) poor eye-hand coordination when using a pencil or scissors. 20 C.F.R. § 416.926a(j)(3).

(5)    *Caring for Yourself*

With respect to this domain, the Commissioner considers how well the child can maintain a healthy emotional and physical state, including how well he gets his physical and emotional wants and needs met in appropriate ways; how he copes with stress and changes in his environment; and whether he takes care of his own health, possessions, and living area.  20 C.F.R. § 416.926a(k).  "Caring for yourself" effectively means the child becomes increasingly independent in making and following his own decisions, which entails relying on his own abilities and skills and displaying consistent judgment about the consequences of caring for himself.  *Id.* § 416.926a(k)(1)(ii).  This domain does not address the child's physical abilities to perform self-care tasks, which are addressed under the domains of Moving About and Manipulating Objects and Health and Physical Well-Being, as appropriate, nor does this domain address the ability to relate to other people, which is addressed under the domain of Interacting and Relating With Others.  SSR 09-7p, 74 Fed. Reg. 7,521-01, at 7,522 (Feb. 17, 2009).  Rather, this domain addresses the child's ability to recognize when he is ill, follow recommended treatment,[14] take medication

---

[14] With respect to the child's ability to follow recommended treatment, the Administration has stated,

> We do not consider a child fully responsible for failing to follow prescribed treatment. Also, the policy of failure to follow prescribed treatment does not apply unless we first find that the child is disabled. Under this policy, we must also find that treatment was prescribed by the child's "treating source" (as defined in 20 CFR 416.902) and that it is clearly expected that, with the treatment, the child would no longer be disabled. Even then, we must consider whether there is a "good reason" for the failure to follow the prescribed treatment. For example, if the child's caregiver believes the side effects of treatment are unacceptable, or an adolescent refuses to take medication because of a mental disorder, we would find that there is a good reason for not following the prescribed treatment. However, if there is not a good reason and all the other requirements are met, a denial based on failure to follow prescribed treatment would be appropriate. See 20 CFR 416.930 and SSR 82-59, Titles II and XVI: Failure To Follow Prescribed Treatment.

SSR 09-7p, 74 Fed. Reg. 7,521-01, at 7,522 n.11 (Feb. 17, 2009).

as prescribed, follow safety rules, respond to his circumstances in safe and appropriate ways, make decisions that do not endanger himself, and know when to ask for help from others. 20 C.F.R. § 416.926a(k)(1)(iv). As with limitations in other domains, limitations[15] in the domain of Caring for Yourself may result from physical or mental impairment(s), medication, or other treatment. SSR 09-7p, 74 Fed. Reg. at 7,522.

(6)    *Health and Physical Well-Being*

Under this domain, the Commissioner considers the cumulative physical effects of physical or mental impairments and their associated treatments or therapies on the child's functioning that were not considered under the domain of Moving and Manipulating Objects. 20 C.F.R. § 416.926a(l). A physical or mental disorder may have physical effects that vary in kind and intensity, and may make it difficult for a child to perform his activities independently or effectively. *Id.* § 416.926a(l)(1). For instance, the child may experience problems such as generalized weakness, dizziness, shortness of breath, reduced stamina, fatigue, psychomotor retardation, allergic reactions, recurrent infection, poor growth, bladder or bowel incontinence, or local or generalized pain. *Id.* In addition, the medications taken (e.g., for asthma or depression) or the treatments received (e.g., chemotherapy or multiple surgeries) may have physical effects that also limit the child's performance of activities. *Id.* § 416.926a(l)(2). Thus, this domain does not address typical development and functioning but rather addresses how recurrent illness, the side effects

---

[15] Examples of limited functioning in Caring for Yourself include: (i) continuing to place non-nutritive or inedible objects in the mouth; (ii) using self-soothing activities showing developmental regression (e.g., thumbsucking, re-chewing food) or exhibiting restrictive or stereotyped mannerisms (e.g., body rocking, headbanging); (iii) not dressing or bathing appropriately for the child's age; (iv) engaging in self-injurious behavior (e.g., suicidal thoughts or actions, self-inflicted injury, or refusal to take medication) or ignoring safety rules; (v) not spontaneously pursuing enjoyable activities or interests; (vi) having disturbance in eating or sleeping patterns. 20 C.F.R. § 416.926a(k)(3).

of medication, and the need for ongoing treatment affect the child's body. SSR 09-8p, 74 Fed. Reg. 7,524-01, at 7,525 (Feb. 17, 2009). Accordingly, there are special considerations in this domain:

> For example:
>
> • A child who otherwise appears to be functioning appropriately may be doing so because of intensive medical or other care needed to maintain health and physical well-being. [The Commissioner] evaluates such medical fragility in this domain.
>
> • Some disorders (for example, cystic fibrosis and asthma) are episodic, with periods of worsening (exacerbation) and improvement (remission). When symptoms and signs fluctuate, [the Commissioner] considers the frequency and duration of exacerbations, as well as the extent to which they affect a child's ability to function physically.
>
> In all cases, it is important to remember that the cumulative physical effects of a child's physical or mental impairment(s) can vary in kind and intensity, and can affect each child differently.

*Id.* at 7,526 (footnote omitted). Further, as in all domains, the child's limitations[16] in Health and Physical Well-Being must result from a medically determinable impairment(s). 20 C.F.R. § 416.926a(l)(4).

---

[16] Examples of limitations in Health and Physical Well-Being include: (i) generalized symptoms, such as weakness, dizziness, agitation (e.g., excitability), lethargy (e.g., fatigue or loss of energy or stamina), or psychomotor retardation because of an impairment(s); (ii) somatic complaints related to impairments (e.g., seizure or convulsive activity, headaches, incontinence, recurrent infections, allergies, changes in weight or eating habits, stomach discomfort, nausea, headaches, or insomnia); (iii) limitations in physical functioning because of treatment (e.g., chemotherapy, multiple surgeries, chelation, pulmonary cleansing, or nebulizer treatments); (iv) exacerbations from one impairment or a combination of impairments that interfere with physical functioning; (v) the child is medically fragile and needs intensive medical care to maintain his level of health and physical well-being. 20 C.F.R. § 416.926a(l)(4).

*The "Whole Child" Approach*

Functional equivalence to a listed impairment is evaluated using the "whole child" approach, which requires consideration of "how the child functions every day and in all settings compared to other children the same age who do not have impairments." SSR 09-1p, 74 Fed. Reg. 7,527-01, at 7,528 (Feb. 17, 2009). The "whole child" approach involves answering the following questions:

(1)     How does the child function?

(2)     Which domains are involved in performing the activities?

(3)     Could the child's medically determinable impairment(s) account for limitations in the child's activities?

(4)     To what degree does the impairment(s) limit the child's ability to function age-appropriately in each domain?

*Id.*

In assessing a child's degree of limitation in any given domain, the "whole child" approach requires consideration of "how well the child can initiate, sustain, and complete activities," which involves evaluating "the kind, extent, and frequency of help or adaptations the child needs, the effects of structured or supportive settings on the child's functioning, where the child has difficulties (at home, at school, and in the community), and all other factors that are relevant." *Id.* (citing 20 C.F.R. § 416.924a). The degree of limitation in a domain is based on the answers to five questions:

(1)     How many of the child's activities in the domain are limited (for example, one, few, several, many, or all)?

(2)     How important are the limited activities to the child's age-appropriate functioning (for example, basic, marginally important, or essential)?

  (3)  How frequently do the activities occur and how frequently are they limited (for example, daily, once a week, or only occasionally)?

  (4)  Where do the limitations occur (for example, only at home or in all settings)?

  (5)  What factors are involved in the limited activities (for example, does the child receive support from a person, medication, treatment, device, or structured/supportive setting)?

*Id.* at 7,530–31. "There is no set formula for applying these considerations in each case. . . . The judgment about whether there is a "marked" or "extreme" limitation of a domain depends on the importance and frequency of the limited activities and the relative weight of the other considerations described above." *Id.*

## DISCUSSION

  As previously stated, Plaintiff filed a two-page brief and two-page response brief in this action and did not cite any specific objections to or error in the ALJ's decision. Because Plaintiff is proceeding pro se, the Court is charged with liberally construing Plaintiff's brief to allow for the development of a potentially meritorious claim. *See Boag v. MacDougall*, 454 U.S. 364, 365 (1982); *see also Barnett*, 174 F.3d at 1133 (stating that the mandated liberal construction of pro se pleadings means only that if the court can reasonably read the pleadings to state a valid claim on which the plaintiff could prevail, it should do so). Accordingly, the Court construes Plaintiff's arguments as a challenge to the ALJ's conclusion that J.D.S.'s impairments did not functionally equal a listed impairment

because Plaintiff generally argues J.D.S. is disabled without stating that J.D.S.'s impairments meet or equal a listed impairment.[17]

The Court reiterates that judicial review of a Social Security decision is narrowly tailored "to determining whether the findings are supported by substantial evidence and whether the correct law was applied." *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir.2002). While the ALJ here found J.D.S. had a severe impairment, this finding does not, by itself, mean J.D.S. is entitled to SSI; rather, to obtain benefits, the evidence must show J.D.S.'s impairments are of a disabling severity. *See Trenary v. Bowen*, 898 F.2d 1361, 1364 (8th Cir.1990) (stating a court's proper focus is not on a claimant's diagnosis but on the claimant's actual function limitations); *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986) (stating the mere presence of impairments does not automatically entitle a claimant to disability benefits—the claimant must show functional loss related to his or her impairments).

**Medical Evidence of Record**

J.D.S. has a history of asthma with treatment in the emergency room and by his primary care physician, R. Dale Padgett, M.D. On January 28, 2008, J.D.S. presented in

---

[17] The Court also reviewed the additional medical evidence provided by Plaintiff to determine whether remand was warranted under sentence six of 42 U.S.C. § 405(g). As stated above, a reviewing court may remand a case to the Commissioner on the basis of new evidence only if four prerequisites are met: (1) the evidence is relevant to the determination of disability at the time the application was first filed; (2) the evidence is material to the extent that the Commissioner's decision might reasonably have been different had the new evidence been before him; (3) there is good cause for the claimant's failure to submit the evidence when the claim was before the Commissioner; and (4) the claimant made at least a general showing of the nature of the new evidence to the reviewing court. *Borders*, 777 F.2d at 955 (citations omitted). The Court concludes these prerequisites are not met in this case. First, certain of the medical records provided by Plaintiff were not even related to J.D.S. [*See, e.g.*, Doc 29-2.] Second, the vast majority of the remaining medical records were duplicative of the record before the ALJ. [*See, e.g.*, Doc. 29-3.] Finally, the documents that are new did not indicate J.D.S.'s impairments are more severe than noted by the ALJ and, therefore, the additional evidence is not material because it does not indicate the ALJ's decision would have been different had the evidence been before him. Thus, a remand pursuant to sentence six is not warranted in this case.

the emergency department for asthma. [R. 136; *see* R. 135–44.] A chest x-ray showed "mild peribronchial inflammatory disease but no frank consolidation." [R. 136, 142.] The physician noted that J.D.S.'s "mother d[id] not really understand when she is to give nebulization treatments" [R. 136] and that "child and mother showed extremely poor technique and understanding" of using J.D.S.'s metered inhaler [R. 137]. J.D.S. improved with medications and was "completely asymptomatic" at the time of discharge. [*Id.*] The physician diagnosed status asthmaticus and probable mild persistent asthma. [*Id.*]

At a follow-up appointment on February 4, 2008, the examining nurse in Dr. Padgett's office noted J.D.S. was doing much better and had clear lungs. [R. 172.] On February 7, 2008, J.D.S. presented to the emergency room; Plaintiff stated J.D.S. was running a fever and had an asthma attack. [R. 152.] Because the emergency room was full, J.D.S. left before treatment in stable condition. [*Id.*]

In July 2008, J.D.S. presented to the emergency room for swelling around his eyes. [R. 147.] He had clear and equal breath sounds and was in no respiratory distress. [R. 148.] The physician prescribed medication for allergies. [R. 150.]

J.D.S. was seen in his physician's office in June and July 2009 and was noted to have clear lungs and was told to use Neosporin for swollen eye lids. [R. 169–70.] On October 29, 2009, J.D.S. presented to the emergency room for asthma. [R. 128.] After breathing treatments, J.D.S. had decreased air exchange with occasional rhonchi, but no wheezing, no accessory muscle use, no retractions, and no prolongation of the expiratory phase. [R. 129.] A chest x-ray showed "slightly increased perihilar markings, no acute infiltrate noted." [*Id.*] The physician diagnosed an asthma exacerbation, with a history of very poorly controlled persistent asthma and failed outpatient treatment, with somewhat

23

poor recognition of symptoms. [*Id.*] The physician questioned whether J.D.S. was getting his proper medication dosages and admitted him for treatment. [*Id.*] Finally, the physician noted the family should receive asthma education during J.D.S.'s hospitalization. [*Id.*] J.D.S. was discharged two days later. [*See* R. 161.]

On November 5, 2009, J.D.S. was seen at a follow-up appointment. [R. 161–62.] The physician noted J.D.S. had nighttime coughing and wheezing but was "[d]oing great" since his hospitalization and generally needed to use his albuterol inhaler two to three times a week. [R. 161.] On examination, J.D.S.'s lungs were normal with no wheezing, rhonchi, or rales/crackles. [*Id.*] J.D.S. and his mother received instructions regarding his medications. [R. 162.]

At an appointment on December 2, 2009, J.D.S. complained of a sore throat but had normal lungs on examination. [R. 157–58.] Three days later, J.D.S. returned to the doctor following an asthma attack at school the day before. [R. 154.] The physician diagnosed allergic rhinitis and asthma exacerbation, provided medications, and educated Plaintiff about asthma. [R. 155–56.]

J.D.S. followed up with Dr. Padgett on January 22, 2010 and had clear lungs. [R. 167.] On January 28, 2010, J.D.S. was treated in the emergency room for an upper respiratory infection and pneumonia but had clear lungs and non-labored respirations. [R. 198–99; see also R. 222–23 (duplicates).] In February 2010, J.D.S. had some chest congestion but no wheezing. [R. 166.]

In April 2010, J.D.S. had several asthma flare ups, with minimal to moderate symptoms. [R. 186–97; *see also* R. 207–18 (duplicates).] During one visit, Plaintiff did not

want to wait for a respiratory therapist and left the hospital. [R. 189.] The physician noted that rather than forcing Plaintiff to sign American Medical Association forms indicating she was leaving against medical advice, he prescribed appropriate therapy and noted J.D.S. was active and in no acute distress. [*Id.*]

In May 2010, J.D.S. saw a pulmonary specialist, who stated J.D.S. had been experiencing worsening asthma symptoms over the past two months. [R. 204.] He noted J.D.S.'s asthma needed better control and educated J.D.S. and Plaintiff about how to use the prescribed inhaler. [R. 205.] In June 2010, the pulmonary specialist noted there was "[p]oor understanding of [prescription] use/maintenance vs rescue" and room for improved control. [R. 203.] He prescribed medications and provided asthma education. [*Id.*]

**Opinions of State Agency Consultants**

On March 16, 2009, state agency physician Jean Smolka, M.D., reviewed the evidence and concluded J.D.S.'s impairments were severe but did not meet, medically equal, or functionally equal a listing. [R. 115; *see* R. 115–20.] Dr. Smolka found J.D.S. had "less than marked" limitations in the domain of Health and Physical Well-Being but "no limitation" in the other five domains. [R. 117–18.] In July 2009, state agency psychiatrist Katrina Doig, M.D., and state agency psychologist Michael Neboschick, Ph.D., reviewed the evidence and concluded J.D.S. did not have a medically determinable mental impairment. [R. 121; *see* R. 121–26.] Drs. Doig and Neboschick reached the same conclusions as Dr. Smolka with respect to J.D.S.'s degree of limitation in the six domains. [R. 123–24.]

**Questionnaires**

In March 2008, Valerie Rome, a teaching assistant in J.D.S.'s pre-kindergarten classroom, completed a questionnaire about J.D.S. [R. 67–74.] Ms. Rome stated J.D.S. could write some numbers and letters of the alphabet. [R. 67.] As to each functional domain, Ms. Rome reported as follows:

- *Acquiring and Using Information*: Ms. Rome indicated J.D.S. had "no problem" with the listed activities as compared to the functioning of same-aged children without impairments. [R. 68.] Ms. Rome stated, "This child does very well with his class work. He is not a problem child. He behaves well in class like listening, working well with other children. He loves to work on computers and loves books. He seems to be very bright." [*Id.*]

- *Attending and Completing Tasks*: While J.D.S. mostly had "no problem" with the listed activities as compared to other children, Ms. Rome indicated J.D.S. had "a slight problem" with waiting to take turns, completing class assignments, and completing work accurately without careless mistakes. [R. 69.]

- *Interacting and Relating With Others*: Ms. Rome observed no problems in this domain and indicated J.D.S. did not require behavior modification strategies. [R. 70.] Ms. Rome also indicated she could understand almost all of J.D.S.' speech on the first attempt. [R. 71.]

- *Moving About and Manipulating Objects*: Ms. Rome observed no problems in this domain. [*Id.*]

- *Caring for Yourself*: Ms. Rome observed no problems in this domain. [R. 72.]

- *Health and Physical Well-Being*: Ms. Rome noted J.D.S. had asthma but "took sick only once or twice at school with shortness of breath" and "only missed 1 week from school due to illness." [R. 73.] Ms. Rome indicated she did not know whether J.D.S. took medication on a regular basis. [*Id.*]

In December 2008, Plaintiff completed a Function Report. [R. 75–82.] She indicated J.D.S. did not have problems seeing or hearing. [R. 76.] Further, Plaintiff

indicated J.D.S. was not totally unable to talk; most of the time, his speech could be understood by people who knew him well, and some of the time, his speech could be understood by people who did not know him well.  [R. 77.]  Moreover, Plaintiff indicated J.D.S. had a limited ability to communicate.  [R. 78.]  Specifically, J.D.S. did not ask a lot of what, why, and where questions; use complete sentences of more than four words most of the time; talk about what he was doing; take part in conversations with other children; tell about things and activities that happened in the past and could not tell a made up or familiar short story or deliver simple messages.  [*Id.*]  On the other hand, Plaintiff indicated J.D.S. could ask for what he wanted and answer questions about a short read-aloud children's story or TV story.  [*Id.*]

Plaintiff also indicated J.D.S.'s impairments limited his progress in understanding and using what he has learned.  [R. 79.]  Plaintiff indicated J.D.S. could not ask what words mean; define common words; or read capital letters of the alphabet and did not know his birthday or telephone number.  [*Id.*]  However, Plaintiff indicated J.D.S. could recite numbers to three; count three objects; recite numbers to ten; identify most colors and shapes; and understand a joke, and J.D.S. knew his age.  [*Id.*]  As to J.D.S.'s physical abilities, Plaintiff indicated J.D.S. could not use scissors fairly well but could catch a large ball; ride a tricycle, big wheel, or bike with training wheels; wind up a toy; print some letters; and copy his first name.  [R. 80.]  Further, Plaintiff indicated J.D.S.'s impairments affected his behavior with other people.  [*Id.*]  Specifically, J.D.S. did not enjoy being with other children his age; show affection toward other children; share toys; take turns; play

"pretend" with other children; or play games like tag and hide-and-seek or board games, but J.D.S. was affectionate toward his parents.  [*Id.*]

As to caring for his personal needs, Plaintiff indicated J.D.S. could not bathe or brush his teeth without help but could dress himself without help, eat with a fork and spoon by himself, brush his teeth with help, and put his toys away.  [R. 81.]  Moreover, J.D.S. usually controlled his bowels and bladder during the day.  [*Id.*]  Finally, Plaintiff indicated J.D.S. had a limited ability to pay attention and stick with a task and could pay attention to TV, music, reading aloud, or games for fifteen minutes.  [*Id.*]   In the Disability Report completed as part of Plaintiff's appeal [R. 99–104], Plaintiff said J.D.S.'s impairments did not have any effect on his ability to care for his personal needs but that he could not play like he wanted [R. 102].

**ALJ's Functional Equivalence Analysis**

Based on a review of the relevant evidence from parents and care givers, including how J.D.S. functioned at home, at school, and in the community, and evaluating the six relevant domains with respect to the "whole child," the ALJ found the medical evidence did not support a finding of functional equivalence.  [R. 12–21.]  With respect to the domain of Acquiring and Using Information, the ALJ found J.D.S. had no limitation.  [R. 16.]  The ALJ relied on the evidence from Ms. Rome, who indicated J.D.S. had no observed problems in this domain, did very well with his class work, was not a problem child, behaved well in class, listened and worked well with other children, and loved to work on computers.  [*Id.*]  With respect to the domain of Attending and Completing Tasks, the ALJ found J.D.S. had no limitation; the ALJ relied on the evidence from Ms. Rome, who

indicated J.D.S. had no problems in ten of thirteen activities in this domain and only slight problems in the remaining three activities. [R. 17.] With respect to the domain of Interacting and Relating With Others, the ALJ found J.D.S. had no limitation; the ALJ relied on the evidence from Ms. Rome, who indicated J.D.S. had no problems in this domain and worked well with others and that she could understand almost all of J.D.S.' speech. [R. 18.] The ALJ also noted Plaintiff indicated J.D.S. is affectionate towards his parents. [*Id.*]

With respect to the domain of Moving About and Manipulating Objects, the ALJ found J.D.S. had no limitation; the ALJ relied on the evidence from Ms. Rome, who indicated J.D.S. had no problems in this domain. [R. 19.] The ALJ also noted Plaintiff indicated J.D.S. can catch a large ball, like a beach ball; ride a big wheel, tricycle, or bike with training wheels; and wind up a toy. [*Id.*] With respect to the domain of Caring for Yourself, the ALJ found J.D.S. had no limitation; the ALJ relied on the evidence from Ms. Rome, who indicated J.D.S. had no problems in this domain. [R. 20.]

With respect to the domain of Health and Physical Well-Being, the ALJ found J.D.S. had less than marked limitation. [R. 21.] The ALJ relied on the evidence from Ms. Rome, who indicated J.D.S. had asthma, took sick once or twice at school with shortness of breath, and missed only one week of school due to illness. [*Id.*] The ALJ also found the medical evidence supported a finding of less than marked limitation due to asthma because J.D.S.'s "exacerbations were on more than one occasion associated with poor understanding of medication use as opposed to persistent symptoms despite proper medication use." [*Id.*] Accordingly, the ALJ concluded J.D.S. was not disabled because he did not have an impairment or combination of impairments that resulted in either "marked" limitations in two domains or "extreme" limitation in one domain. [*Id.*]

**Analysis**

As outlined above, to assess functional equivalence, the ALJ must consider the interactive and cumulative effects of all of the child's impairments for which there is record evidence, including any non-severe impairments. 20 C.F.R. § 416.926a(a). The ALJ must take into account everything the child does at home, at school, and in the community and determine what the child cannot do, has difficulty doing, needs help doing, or is restricted from doing because of his impairment(s), which involves an assessment of how the child functions in activities in terms of the six broad areas of functioning—called domains—intended to capture what a child can or cannot do. *Id.* § 416.926a(a), (b)(1). To establish functional equivalence, the child must have a medically determinable impairment or combination of impairments that results either in "marked" limitations in two domains or an "extreme" limitation in one domain. *Id.* § 416.926a(a), (d). In assessing a child's degree of limitation in any given domain, the ALJ must utilize the "whole child" approach, which requires considering "how well the child can initiate, sustain, and complete activities" and evaluating "the kind, extent, and frequency of help or adaptations the child needs, the effects of structured or supportive settings on the child's functioning, where the child has difficulties (at home, at school, and in the community), and all other factors that are relevant." SSR 09-1p, 74 Fed. Reg. at 7,528 (citing 20 C.F.R. § 416.924a).

Here, the ALJ first outlined the evidence informing his decision, including the Function Report completed by Plaintiff, the state agency consultants' opinions, and the medical evidence. [R. 13–15.] Then, the ALJ analyzed the six functional equivalence domains and found J.D.S.'s degree of limitation with respect to each domain, stating the evidence supporting the ALJ's conclusion. [R. 15–21.] As noted by the ALJ, several of

30

J.D.S.'s emergency room or doctors' visits for exacerbation of his asthma were associated with poor understanding of proper medication use. [*See, e.g.*, 129, 136–37, 203.] Further, Ms. Rome indicated she did not know whether J.D.S. took medication on a regular basis [R. 73], which suggests J.D.S.'s asthma was not as severe as alleged because, apparently, he did not regularly use an inhaler or take other asthma medications at school. Upon review, the Court finds there is no evidence of a marked limitation in any domain; that is, there is no evidence J.D.S.'s impairments seriously interfered with his ability to independently initiate, sustain, or complete activities. *See* 20 C.F.R. § 416.926a(e)(2)(i).

Moreover, while Plaintiff's responses in the Function Report provided on behalf of J.D.S. [R. 75–82] contradict the report of Ms. Rome [R. 67–74] regarding J.D.S.'s limitations,[18] the responsibility for resolving such conflicts in the evidence falls on the ALJ, not on the reviewing court, *Craig*, 76 F.3d at 589. The ALJ's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Thus, it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment for that of the Commissioner so long as the decision is supported by substantial evidence. *Laws*, 368 F.2d at 642; *Snyder*, 307 F.2d at 520. Although Plaintiff may disagree with the ALJ's determination, the Court is constrained to affirm the ALJ's decision so long as substantial evidence of record supports that decision. *See Edwards*, 937 F.2d at 584 n.3 (stating that where the Commissioner's decision is supported by substantial evidence, the court will affirm, even if the reviewer would have

---

[18] For example, Plaintiff indicated J.D.S. has limitations in his ability to understand and use what he has learned [R. 79], but Ms. Rome indicated J.D.S. does very well with his class work [R. 68]. Plaintiff indicated J.D.S.'s impairments affect his behavior with other people [R. 80], but Ms. Rome indicated J.D.S. "is not a problem child," behaves well in class, and works well with other children [R. 68].

reached a contrary result as finder of fact and even if the reviewer finds that the evidence preponderates against the Commissioner's decision). Here, because the Court failed to find any evidence of a marked limitation in any domain, the Court concludes substantial evidence supports the ALJ's decision regarding functional equivalence and recommends the denial of benefits be affirmed.

## CONCLUSION AND RECOMMENDATION

Wherefore, based on the foregoing, it is recommended that the decision of the Commissioner be affirmed.

IT IS SO RECOMMENDED.

s/Jacquelyn D. Austin
United States Magistrate Judge

February 29, 2012
Greenville, South Carolina